Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYNE GEIST, derivatively on behalf of GOODRX HOLDINGS, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| DOUGLAS HIRSCH, TREVOR BEZDEK, KARSTEN VOERMANN, CHRISTOPHER ADAMS, JULIE BRADLEY, DIPANJAN DEB, ADAM KAROL, JACQUELINE KOSECOFF, STEPHEN LESIEUR, GREGORY MONDRE, and AGNES REY-GIRAUD, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| GOODRX HOLDINGS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

**INTRODUCTION**

Plaintiff Wayne Geist ("Plaintiff"), by Plaintiff undersigned attorneys, derivatively and on behalf of Nominal Defendant GoodRx Holdings, Inc. ("GoodRx" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Douglas Hirsch, Trevor Bezdek, Karsten Voermann, Christopher Adams, Julie Bradley, Dipanjan Deb, Adam Karol, Jacqueline Kosecoff, Stephen LeSieur, Gregory Mondre, and Agnes Rey-Giraud (collectively, the "Individual Defendants," and together with GoodRx, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of GoodRx and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GoodRx, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by GoodRx's directors and officers from September 23, 2020 through November 16, 2020 (the "Relevant Period").

2.     GoodRx operates a digital healthcare platform which provides consumers in the United States with price transparency and discount codes for medications.

3.     The Company's service is free to consumers, and it predominantly generates revenue through prescription transaction fees paid by Pharmacy Benefit Managers ("PBMs"), which, *inter alia*, set prices between consumers and pharmacies. PBMs pay GoodRx a fee when a prescription is filled using a GoodRx discount code.

4.     In July 2020, the Company, founded in September 2011, began the process of going public. On July 2, 2020, the Company filed a draft registration statement on Form DRS with the SEC in preparation for the planned initial public offering ("IPO"). On August 28, 2020, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement"). On September 14, 2020, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC. The amendment stated that 39,807,691 would be registered in the IPO, at a proposed maximum offering price per share of $28.00. Another amendment was filed with the SEC on September 22, 2020. That same day, September 22, 2020, the Registration Statement was declared effective.

5.     On September 23, 2020, the Company's stock began trading publicly on the NASDAQ. On September 24, 2020, the Company filed a Prospectus on Form 424B4 (the "Prospectus") with the SEC in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement. Taken together, the Prospectus, the Registration Statement, and the amendments to the Registration Statement are referred to herein as the "Offering Documents." As a result of the IPO, over 28.6 million shares of stock were sold at $33 per share. GoodRx received aggregate net proceeds of about $886.9 million. Of the proceeds, Idea Men, LLC ("Idea Men")—whose managing members included Defendants Douglas Hirsch ("Hirsch") and Trevor Bezdek ("Bezdek")—and Spectrum Equity VII, L.P. ("Spectrum")—whose managing directors included Defendant Stephen LeSieur ("LeSieur")—collectively gained approximately $348.9 million from the sale of their GoodRx shares.

6.     The Offering Documents highlighted GoodRx's purported competitive advantage and described the competitive risks facing the Company. The Offering Documents stated only that Company may deal with increased competition in the future that could negatively impact GoodRx's business and its ability to attract and retain consumers.

7.     The Individual Defendants failed to correct the material misstatements and omissions in the Offering Documents regarding competition. In fact, the Company's 3Q 2020 10-Q (defined below), which the Company filed with the SEC on November 12, 2020 repeated many of the same false and misleading statements contained in the Offering Documents. The 3Q 2020 10-Q did this even though, prior to its being filed, Amazon.com, Inc. ("Amazon") announced a service designed to compete with GoodRx. Relatedly, on a November 12, 2020 earnings call, Defendant Bezdek even stated that the Company had "not seen … any competitors that have really impacted [GoodRx's] business[.]"

8.     These statements glossed over the fact that Amazon had been developed a service to become a direct competitor of GoodRx, that Amazon's service was scheduled to deploy just after the Company's IPO, and that, therefore, increased competition in the future was not a potential risk, but a serious, actual risk which seriously threatened the Company.

9.     Specifically, the Offering Documents and 3Q 2020 10-Q failed to disclose that Amazon would give Amazon Prime members up to an 80% discount off of the price of generic medications and up to a 40% discount off of the price of brand-name prescription medications beginning in November 2020. On November 17, 2020, Amazon issued a press release which introduced "Amazon Pharmacy."

10.     Following this announcement, the price of the Company's stock fell $10.51 per share, or approximately 22.5%, from $46.72 at the close of trading on November 16, 2020, to $36.21 at the close of trading on November 17, 2020.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about GoodRx's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Amazon was developing and soon deploying an online pharmacy offering heavily discounted prescription medication; (2) the Individual Defendants intentionally held the Company's IPO before Amazon announced this service, to avoid having its existence hamper the Company's IPO share price; and (3) that the IPO was intentionally planned in such a way as to sell shares of the Company's common stock at artificially inflated prices. As a result, GoodRx's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

13.     In yet further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     The Individual Defendants' misconduct has subjected GoodRx, its two Co-Chief Executive Officers ("Co-CEO"), and its Chief Financial Officer ("CFO"), to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, and the need to implement adequate internal controls over its financial reporting. As a result of this, the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative

Verified Shareholder Derivative Complaint

action and the Co-CEOs' and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of GoodRx's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a conducting business in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.     Venue is proper in this District because GoodRx and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of GoodRx common stock. Plaintiff has continuously held GoodRx common stock at all relevant times.

### Nominal Defendant GoodRx

24.     GoodRx is a Delaware corporation with principal executive offices at 2701 Olympic Boulevard, Santa Monica, CA 90404. GoodRx's shares trade on the NASDAQ under the ticker symbol "GDRX."

25.     The Company has two classes of common stock—Class A and Class B. Each Class A share is entitled to one vote per share while each Class B share is entitled to ten votes per share. Class B common stock is convertible into one share of Class A common stock at any time  at the shareholder's option and will automatically convert to Class A common stock when transferred in most cases. All Class B common stock will automatically convert to Class A common stock upon the earlier of: (i) September 25, 2027; and (ii) the first date the aggregate number of shares of Class B common stock ceases to represent at least 10% of the aggregate outstanding shares of common stock.

### Defendant Hirsch

26.     Defendant Hirsch is the cofounder of the Company and has been one of two Co-CEOs since January 2015. He has been a Company director since September 2011. He was also CEO from September 2011 until January 2015.

27.     For the fiscal year ended December 31, 2020, Defendant Hirsch received $267,650,186 in compensation from the Company, including $500,000 in salary, $785 in bonus, $266,662,480 in stock awards, $480,000 in non-equity incentive plan compensation, and $6,921 in all other compensation.

### Defendant Bezdek

28.     Defendant Bezdek is the cofounder of the Company and has been one of two Co-CEOs since January 2015. He has been Company director since September 2011. He

Verified Shareholder Derivative Complaint

is also a member of both the Compliance Committee and the Nominating and Corporate Governance Committee.

29.     For the fiscal year ended December 31, 2020, Defendant Bezdek received $267,652,442 in compensation from the Company, including $500,000 in salary, $451 in bonus, $266,662,480 in stock awards, $480,000 in non-equity incentive plan compensation, and $9,511 in all other compensation.

**Defendant Voermann**

30.     Defendant Karsten Voermann ("Voermann") has been the Company's CFO since March 2020.

31.     Defendant Voermann has been the Company's CFO since March 2, 2020, and, per the terms of his offer letter, he was entitled to a base salary of $400,000 per year, a signing bonus of $250,000, and other compensation in the form of certain benefits and equity compensation.

**Defendant Adams**

32.     Defendant Christopher Adams ("Adams") has been a Company director since October 2015. He is as the Chair of the Nominating and Corporate Governance Committee.

**Defendant Bradley**

33.     Defendant Julie Bradley ("Bradley") has been a Company director since August 2020. She is the Chair of the Audit Committee.

34.     For the fiscal year ended December 31, 2020, Defendant Bradley received $748,207 in compensation from the Company, including $5,707 in fees earned or paid in cash and $742,500 in stock awards.

**Defendant Deb**

35.     Defendant Dipanjan Deb ("Deb") has been a Company director since October 2015. He is a member of the Compensation Committee.

**Defendant Karol**

36.     Defendant Adam Karol ("Karol") has been a Company director since October 2018. He is also a member of both the Audit Committee and the Compliance Committee.

**Defendant Kosecoff**

37.     Defendant Jacqueline Kosecoff ("Kosecoff") has been a Company director since May 2016. She is a member of the Compensation Committee.

38.     For the fiscal year ended December 31, 2020, Defendant Kosecoff received $121,842 in compensation from the Company, including $25,242 in fees earned or paid in cash and $96,600 in option awards.

**Defendant LeSieur**

39.     Defendant LeSieur has been a Company director since October 2015. He is a member of the Compliance Committee.

**Defendant Mondre**

40.     Defendant Gregory Mondre ("Mondre") has been a Company director since October 2018. He is the Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

**Defendant Rey-Giraud**

41.     Defendant Agnes Rey-Giraud ("Rey-Giraud") has been a Company director since June 2016. She is the Chair of the Compliance Committee and a member of the Audit Committee.

42.     For the fiscal year ended December 31, 2020, Defendant Rey-Giraud received $118,601 in compensation from the Company, including $21,359 in fees earned or paid in cash and $97,242 in option awards.

Verified Shareholder Derivative Complaint

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

43.     GoodRx is a holding company which, through its subsidiaries, primarily GoodRx, Inc., operates digital healthcare platform to assist customers in understanding, accessing, and affording healthcare. The Company provides access to price transparency and affordability solutions for medications through its price comparison platform that provides customers with prescription pricing information and negotiated prices through codes that can be used to reduce prescription prices.

44.     The Company was incorporated in September 2015 and in October 2015, the Company acquired all the outstanding shares of GoodRx, Inc.—founded by Defendants Hirsch and Bezdek in September 2011.

45.     The Company primarily generates revenue through prescription transaction fees paid by PBMs when a GoodRx discount code is applied to a prescription. Standard agreements between GoodRx and PBMs provide that the prescription transaction fee is paid either as a percentage of fees which the PBM charges the pharmacy or a fixed amount per type of drug prescription. GoodRx recognizes revenue for an estimated fee when a prescription for medication is filled.

### GoodRx's IPO

46.     On July 2, 2020, the Company filed a draft registration statement on Form DRS with the SEC in preparation for an IPO. On August 28, 2020, the Company filed the Registration Statement. On September 14, 2020, the Company filed an amendment to the Registration Statement. The amendment stated that 39,807,691 shares would be registered in the IPO, at a proposed maximum offering price per share of $28.00. A second amendment to the Registration Statement was filed on September 22, 2020. That same day, September 22, 2020, the Registration Statement was declared effective.

47.     On September 23, 2020, the Company's common stock began trading on the NASDAQ. On September 24, 2020, the Company filed the Prospectus with the SEC,

which formed a part of and was incorporated into the Registration Statement. The IPO closed the next day, September 25, 2020. The Company sold 28,615,034 shares of Company stock to the public at $33 per share and an additional 5,192,307 shares pursuant to underwriter options. GoodRx received aggregate net proceeds of approximately $886.9 million, after deducting underwriter discounts and commissions and other expenses.

### The Individual Defendants Knowledge of Amazon's Plans

48.    During the Relevant Period, when the Individual Defendants made and/or caused the Company to make, the materially false and misleading statements to artificially inflate the Company's stock price, the Individual Defendants either had actual knowledge or acted in reckless disregard for the truth that Amazon was developing and soon deploying an online pharmacy offering heavily discounted prescription medication intended to compete directly with GoodRx.

49.    The Company's IPO was timed to close before Amazon announced this development so that the Individual Defendants could maximize the amount of capital GoodRx and the selling shareholders—including Idea Men, whose managing members included Defendants Hirsch and Bezdek; Spectrum, whose managing directors included Defendant LeSieur; and non-party Andrew Slutsky—raised. Out of the IPO's $886.9 million raised, the selling shareholders raised over $369 million. Out of the selling shareholders' $369 million, Idea Men, Spectrum, and non-party Slutsky collectively received $356.2 million. This demonstrates the Individual Defendants' motive in facilitating and participating in the fraud.

50.    The Company's price comparison platform, discussed above, which provides access to discounted prices of prescription drugs to consumers through GoodRx codes represented the Company's core operation and its primary stream of revenue. It was undoubtedly vital to the Company's financial viability and its business prospects. The development of a competitor's product, much less a competitor of Amazon's scale, offering large discounts on prescription medication, would be known to, at least, the

Company's officers and directors as it would pose a substantial threat to the Company's continued operations. Therefore, senior executives and directors of the Company are presumed to have knowledge and awareness of facts and circumstances related to Amazon's pharmaceutical offerings during the Relevant Period.

51.     Finally, the Individual Defendants had actual knowledge that Amazon was developing and soon deploying an online pharmacy offering heavily discounted prescription medication since Amazon was a close business partner of GoodRx. The Offering Documents stated that the Company maintains a direct relationship with Amazon in using Amazon Web Services to build a "modular system of services" and further relied on Amazon Web Services for a "substantial portion" of the Company's computing and storage capacity. In addition, Amazon was able to offer its steep discounted prices through a partnership with Inside Rx, LLC—a company that GoodRx itself had utilized since May 2017 to help it lower the price of more than 209 prescription medications. Thus, the Individual Defendants would have known about Amazon's online pharmacy during the Relevant Period.

**False and Misleading Statements**

***The Offering Documents***

52.     On September 24, 2020, the day after the Company's stock began trading on the NASDAQ, the Company filed with the SEC the Prospectus in connection with the IPO. The Prospectus formed a part of and was incorporated into the Registration Statement, which had been filed with the SEC on August 28, 2020 and was signed by the Individual Defendants.

53.     The Offering Documents stated the following regarding the Company's competitiveness, in pertinent part:

> Our partnerships across the healthcare ecosystem, scale and strong consumer brand ***create a deep competitive moat that is reinforced by our proprietary technology platform***, which processes over 150 billion pricing data points

every day and integrates that data into an interface that is convenient and easy to use for consumers.

(Emphasis added.)

54.    The Offering Documents proclaimed that the Company enjoyed certain advantages which placed GoodRx above the competition, stating, in pertinent part:

**What Sets Us Apart**

We are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects that further strengthen our competitive position. Our competitive strengths consist of*:*

- *Leading Platform:* We believe that we are the largest platform that aggregates pricing for prescriptions. Our proprietary platform enables us to collect and normalize over 150 billion prescription pricing data points every day from sources spanning the healthcare industry.

- *Trusted Brand:* We have built a trusted brand based on nearly a decade of consumer-focused product development. We strive to be with the consumer throughout their healthcare journey. We are guided by the principle of doing well for consumers and the healthcare industry as a whole, which we believe helps us build trust, engagement and brand loyalty.

- *Scaled and Growing Network:* Our leading consumer-focused digital healthcare platform and brand have facilitated rapid growth in our consumer base, which has helped us achieve significant scale. As we have scaled, we have been able to increase the savings that we provide our consumers, in part by leveraging our growing consumer base to attract more partners and source better prices.

- *Consumer-focus:* We empower consumers with the tools and resources to navigate the complexity of the healthcare system. Our platform delivers a consumer-first experience that is convenient and is easy to use and understand.

- **Extensible Platform:** The large number of highly engaged consumers who trust our brand and platform provide a strong foundation for the development of new products that extend across the healthcare market. We have demonstrated our ability to develop new products such as our subscription offerings and pharmaceutical manufacturer solutions offering, and integrate acquired companies such as HeyDoctor.

- **Cash Generative Monetization Model:** We believe our business model has facilitated the rapid growth and expansion of our platform. We have a track record of generating cash flows, allowing us to reinvest in platform expansion and growth.

55.     The Offering Documents provided boilerplate risk warnings related to competition that "could" adversely impact the Company's business, without talking about specific, known risks. Specifically, the Offering Documents stated, in pertinent part:

> We compete with companies that provide savings on prescriptions, as well as companies that offer telehealth services and advertising and market access for pharmaceutical manufacturers. *Within the prescriptions market, our competition is fragmented and consists of competitors that are smaller than us in scale.* There can be no assurance that competitors will not develop and market similar offerings to ours, or that industry participants, such as integrated PBMs and pharmacy providers, will not seek to leverage our platform to drive consumer demand and traffic to their networks and eventually away from, or outside of, our platform. We *may* face increased competition from those that attempt to replicate our business model or marketing tactics, such as discount websites, apps, cash back and loyalty programs and new comparison shopping sites from various industry participants, any of which *could* impact our ability to attract and retain consumers.

(Emphasis added.)

56.     The Offering Documents also touted the Company's market share and certain other metrics, stating, in pertinent part:

> Our success is demonstrated by our 4.4 million Monthly Active Consumers for the second quarter of 2020, the 15 million Monthly Visitors for the second quarter of 2020, the approximately $20 billion of cumulative consumer savings generated for GoodRx consumers through June 30, 2020 and our consumer and healthcare professional NPS scores of 90 and 86, respectively, as of February 2020. On average, we have been the most

downloaded medical app on the Apple App Store and Google Play App Store for the last three years. Our GoodRx app had a rating of 4.8 out of 5.0 stars in the Apple App Store and 4.7 out of 5.0 stars in the Google Play App Store, with over 700,000 combined reviews as of June 30, 2020. In both app stores, our HeyDoctor app had a rating of 5.0 out of 5.0 stars, with over 8,000 combined reviews as of June 30, 2020.

57. The Offering Documents noted the Company's belief that its service was in high demand, stating that GoodRx "believe[s] our financial results reflect the significant market demand for our offerings and the value that we provide to the broader healthcare ecosystem."

58. The Offering Documents noted Amazon and GoodRx's existing business relationship and its advantages. The Offering Documents stated that the Company "leverage[s] major third-party cloud and data service providers, such as Amazon Web Services" and that the Company had "built a modular system of services on top of this infrastructure" that was "cloud native, scalable and reliable." The Offering Documents continued:

**We rely on software-as-a-service, or SaaS, technologies from third parties**.

We rely on SaaS technologies from third parties in order to operate critical functions of our business, including financial management services, relationship management services, marketing services and data storage services. For example, we rely on Amazon Web Services for a substantial portion of our computing and storage capacity . . . . Amazon Web Services provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party.

*November 12, 2020 Conference Call and Form 10-Q*

59. On November 12, 2020, the Company issued a press release and held a conference call regarding the third fiscal quarter, ended September 30, 2020. On the call, an analyst asked Defendant Bezdek to "talk about any changes you're seeing in the competitive environment." Defendant Bezdek replied, "what we've seen is we have not seen sort of any competitors that have really impacted our business in any way sort of historically or currently."

60.     That same day, November 12, 2020, the Company filed its quarterly report for the quarter ended September 30, 2020 on Form 10-Q with the SEC (the "3Q 2020 10-Q"). The 3Q 2020 10-Q was signed by Defendants Hirsch, Bezdek, and Voermann and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), also signed by Defendants Hirsch, Bezdek, and Voermann, attesting to the 3Q 2020 10-Q's accuracy.

61.     In identifying "Risk Factors," the 3Q 2020 10-Q issued the same boilerplate warning regarding competition which was contained in the Offering Documents. The 3Q 2020 10-Q stated the following:

> We compete with companies that provide savings on prescriptions, as well as companies that offer telehealth services and advertising and market access for pharmaceutical manufacturers. Within the prescriptions market, ***our competition is fragmented and consists of competitors that are smaller than us in scale***. There can be no assurance that competitors will not develop and market similar offerings to ours, or that industry participants, such as integrated PBMs and pharmacy providers, will not seek to leverage our platform to drive consumer demand and traffic to their networks and eventually away from, or outside of, our platform. We ***may*** face increased competition from those that attempt to replicate our business model or marketing tactics, such as discount websites, apps, cash back and loyalty programs and new comparison shopping sites from various industry participants, any of which ***could*** impact our ability to attract and retain consumers.

(Emphasis added.)

62.     The 3Q 2020 10-Q also touted the quantity of monthly active consumers:

> The number of Monthly Active Consumers is a key indicator of the scale of our consumer base and a gauge for our marketing and engagement efforts. We believe that this metric reflects our scale, growth and engagement with consumers. The number of Monthly Active Consumers grew 29% in the three months ended September 30, 2020 to 4.9 million, compared to 3.8 million in the three months ended September 30, 2019.

63.     Like the Offering Documents, the 3Q 2020 10-Q highlighted the Company's belief that its service was in high demand, stating: "We believe our financial results reflect the significant market demand for our offerings and the value that we provide to the broader healthcare ecosystem."

64.     Also like the Offering Documents, the 3Q 2020 10-Q positively described Amazon's existing relationship with the Company, stating:

> **We rely on software-as-a-service ("SaaS") technologies from third parties**.
>
> We rely on SaaS technologies from third parties in order to operate critical functions of our business, including financial management services, relationship management services, marketing services and data storage services. For example, we rely on Amazon Web Services for a substantial portion of our computing and storage capacity . . . . Amazon Web Services provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party.

(Emphasis added.)

65.     The statements in ¶¶ 53–59 and 61–64 were materially false and misleading, and failed to disclose material facts necessary to render them not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Amazon was developing and soon deploying an online pharmacy offering heavily discounted prescription medication; (2) the Individual Defendants intentionally held the Company's IPO before Amazon announced this service, to avoid having its existence hamper the Company's IPO share price; and (3) that the IPO was intentionally planned in such a way as to sell shares of the Company's common stock at artificially inflated prices. As a result, GoodRx's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

66.     On November 17, 2020, not even two months after the IPO, Amazon issued a press release titled, "Introducing Amazon Pharmacy: Prescription Medications

Delivered." The press release announced "two new pharmacy offerings" rendering Amazon and GoodRx as direct competitors, stating:

> Amazon.com, Inc. (NASDAQ: AMZN) today announced two new pharmacy offerings to help customers conveniently purchase their prescription medications. Amazon Pharmacy, a new store on Amazon, allows customers to complete an entire pharmacy transaction on their desktop or mobile device through the Amazon App. Using a secure pharmacy profile, customers can add their insurance information, manage prescriptions, and choose payment options before checking out. Prime members receive unlimited, free two-day delivery on orders from Amazon Pharmacy included with their membership.

> Also new today, Prime members can access savings on medications at Amazon Pharmacy when paying without insurance, as well as at over 50,000 other participating pharmacies nationwide. The Amazon Prime prescription savings benefit saves members up to 80% off generic and 40% off brand name medications when paying without insurance. Prime members will have access to their prescription savings at checkout on Amazon Pharmacy, or can learn more at amazon.com/primerx.

> Together the Amazon Prime prescription savings benefit and Amazon Pharmacy make it simple for customers to compare prices and purchase medications for home delivery, all in one place.

67. The same day, November 17, 2020, *CNBC* reported that Amazon Prime members would be eligible for the advertised discounts through Amazon's "relationship with the Inside Rx savings program."

68. Following these revelations, the price of the Company's stock fell $10.51 per share, or approximately 22.5%, from $46.72 at the close of trading on November 16, 2020, to $36.21 at the close of trading on November 17, 2020.

## DAMAGES TO GOODRX

69. As a direct and proximate result of the Individual Defendants' misconduct, GoodRx has lost and expended, and will continue to lose and expend, many millions of dollars.

70.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its Co-CEOs, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

71.     Such losses include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

72.     As a direct and proximate result of the Individual Defendants' conduct, GoodRx has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.     Plaintiff brings this action derivatively and for the benefit of GoodRx to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of GoodRx.

74.     GoodRx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

75.     Plaintiff is, and has continuously been at all relevant times, a shareholder of GoodRx. Plaintiff will adequately and fairly represent the interests of GoodRx in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

76.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

77.     A pre-suit demand on the Board of GoodRx is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Hirsch, Bezdek,

Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Rey-Giraud (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was commenced.

78. Demand is excused as to all of the Directors because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

79. In total breach of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

80. Demand is futile on Defendant Hirsch for the following, additional reasons. Defendant Hirsch is the cofounder of the Company and been on of the Company's two Co-CEOs since January 2015. He has been a Company director since September 2011. Prior to being Co-CEO, he was the CEO at the Company from September 2011 until January 2015. For these reasons, and as the Company admits, he is a non-independent director. The Company provides Defendant Hirsch with his primary occupation, and he receives substantial compensation, including $267,650,186 for the fiscal year ended December 31, 2020. As Co-CEO, Defendant Hirsch was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Registration Statement, which he signed, and in the 3Q 2020 10-Q, which he signed and for which he signed SOX certifications. As the Company's highest officer and a trusted Company director, he conducted little oversight of the Company's

engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. In addition, Defendant Hirsch is a defendant in the Securities Class Action. Therefore, Defendant Hirsch breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

81.     Demand is futile on Defendant Bezdek for the following, additional reasons. Defendant Bezdek is the cofounder of the Company and has been one of the Company's two Co-CEOs since January 2015. He has been a Company director since September 2011. He is also a member of both the Compliance Committee and the Nominating and Corporate Governance Committee. For these reasons, and as the Company admits, he is a non-independent director. The Company provides Defendant Bezdek with his primary occupation, and he receives substantial compensation, including $267,652,442 for the fiscal year ended December 31, 2020. As Co-CEO, Defendant Bezdek was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Registration Statement, which he signed, and in the 3Q 2020 10-Q, which he signed and for which he signed SOX certifications. As the Company's highest officer and a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. In addition, Defendant Bezdek is a defendant in the Securities Class Action. Therefore, Defendant Bezdek breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

82.     Demand is futile on Defendant Adams for the following, additional reasons. Defendant Adams has been a Company director since October 2015. He is also the Chair of the Nominating and Corporate Governance Committee. As a trusted Company

director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Adams also signed the false and misleading statements in the Registration Statement. Therefore, Defendant Adams breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

83.     Demand is futile on Defendant Bradley for the following, additional reasons. Defendant Bradley has been a Company director since August 2020. She is also the Chair of the Audit Committee. As a trusted Company director, she conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme. Defendant Bradley also signed the false and misleading statements in the Registration Statement. Therefore, Defendant Bradley breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon her is futile and, thus, excused.

84.     Demand is futile on Defendant Deb for the following, additional reasons. Defendant Deb has been a Company director since October 2015. He is also a member of the Compensation Committee. As a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Deb also signed the false and misleading statements in the Registration Statement. Therefore, Defendant Deb breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

85.     Demand is futile on Defendant Karol for the following, additional reasons. Defendant Karol has been a Company director since October 2018. He is also a member

of both the Audit Committee and the Compliance Committee. As a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Karol also signed the false and misleading statements in the Registration Statement. Therefore, Defendant Karol breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

86.   Demand is futile on Defendant Kosecoff for the following, additional reasons. Defendant Kosecoff has been a Company director since May 2016. She is also a member of the Compensation Committee. As a trusted Company director, she conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme. Defendant Kosecoff also signed the false and misleading statements in the Registration Statement. For these reasons, Defendant Kosecoff breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon her is futile and, thus, excused.

87.   Demand is futile on Defendant LeSieur for the following, additional reasons. Defendant LeSieur has been a Company director since October 2015. He is also a member of the Compliance Committee. As a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant LeSieur also signed the false and misleading statements in the Registration Statement. Therefore, Defendant LeSieur breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

88.   Demand is futile on Defendant Mondre for the following, additional reasons. Defendant Mondre has been a Company director since October 2018. He is also the Chair

of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Mondre also signed the false and misleading statements in the Registration Statement. Therefore, Defendant Mondre breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

89.   Demand is futile on Defendant Rey-Giraud for the following, additional reasons. Defendant Rey-Giraud has been a Company director since June 2016. She is also the Chair of the Compliance Committee and a member of the Audit Committee. As a trusted Company director, she conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme. Defendant Rey-Giraud also signed the false and misleading statements in the Registration Statement. Therefore, Defendant Rey-Giraud breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon her is futile and, thus, excused.

90.   Demand is futile on the Board for the following, additional reasons.

91.   The Directors have longstanding business and personal relationships with each other and the other Individual Defendants which prevent them from acting independently and in the best interests of the Company and its shareholders. Defendants Hirsch and Bezdek cofounded the Company together in September 2011 and have worked together both in their capacities as directors and as Co-Chief CEOs of the Company since that time. In addition, Defendants Adams and Deb have worked together at Francisco Partners Management, L.P. ("Francisco Partners") for over a decade. In finer detail, Defendant Adams has worked at Francisco Partners as a Partner since August

2008 while Defendant Deb—a founder of Francisco Partners—has been the Managing Partner/CEO since September 2005 and a Partner August 1999, the company's founding. Furthermore, Defendants Karol and Mondre have worked together at Silver Lake for an extended period of time. Defendant Karol joined Silver Lake in 2009 as a Principal, and was a director from 2013 until December 2018 when he became a Managing Director. Defendant Mondre joined Silver Lake in 1999 where he is currently the Co-CEO. Prior to this, Defendant Mondre served as Silver Lake's Managing Partner and Managing Director from January 2013 until December 2019. Separately, Defendants Karol and Mondre serve together on the board of directors for A Place for Mom, Inc. Defendant Mondre also serves as a member of the board of directors of Fanatics, Inc. where Defendant Karol has served as a board observer since August 2015. Finally, Defendants Bezdek, Hirsch, Adams, Deb, Kosecoff, LeSieur, and Rey-Giraud have served together on the Board for at least approximately five years. These conflicts of interest prevented the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' misconduct. Therefore, any demand on the Directors would be futile.

92.     Defendants Bradley, Karol, and Rey-Giraud (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Per the terms of the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing the integrity of the Company's financial statements, its compliance with legal and regulatory requirements, and other matters implicating ethical concerns. The Audit Committee Defendants failed to adequately fulfill these responsibilities, allowing the Company to file false and misleading financial statements with the SEC. Therefore, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand upon them is excused.

93.     GoodRx has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, but the Directors have not filed any lawsuits

against themselves or any others who were responsible for that wrongdoing, in an attempt to recover for GoodRx any part of the damages GoodRx has suffered and will continue to suffer as a result. Therefore, any demand upon the Directors would be futile.

94.     The Individual Defendants' conduct, described herein and summarized above, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Therefore, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Directors face a substantial likelihood of liability, they are self-interested in the transactions complained of herein and are not capable of exercising independent and disinterested judgment concerning whether to pursue this action on behalf of the shareholders of the Company. Therefore, demand is excused as futile.

95.     The acts complained of herein constitute violations of fiduciary duties owed by GoodRx's officers and directors. These acts are incapable of ratification.

96.     The Directors may be protected against personal liability for their breaches of fiduciary duty by directors' and officers' liability insurance, if they caused the Company to purchase it for their protection with corporate funds. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, sometimes known as the "insured-versus-insured exclusion." Thus, if the Directors were to sue themselves or certain of GoodRx's officers, they would have no directors' and officers' insurance protection. As a result, the Directors cannot be expected to bring such a suit. However, if a suit is brought derivatively, as this action is, such insurance coverage, if it exists, will provide a basis for the Company to effectuate a recovery. Therefore, demand on the Directors is futile and excused.

97.     If there is no directors' and officers' liability insurance, then the Directors will not cause GoodRx to sue the Individual Defendants named herein, since, if they did,

they would face a large uninsured individual liability. Accordingly, demand is futile in that event, too.

98.     Thus, for the reasons set forth above, all of the Directors, and if not all of them, at least five of them, cannot consider a demand with the requisite disinterestedness and independence. Therefore, demand upon the Board is futile and thus excused.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GoodRx's business and affairs.

101.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

102.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GoodRx.

103.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

104.   In further breach of their fiduciary duties owed to GoodRx, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Amazon was developing and soon deploying an online pharmacy offering heavily discounted prescription medication; (2) the Individual Defendants intentionally held the Company's IPO before Amazon announced this service, to avoid having its

existence hamper the Company's IPO share price; and (3) that the IPO was intentionally planned in such a way as to sell shares of the Company's common stock at artificially inflated prices. As a result of the foregoing, GoodRx's public statements were materially false and misleading at all relevant times.

105. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

106. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

107. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

108.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

109.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GoodRx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

110.   Plaintiff on behalf of GoodRx has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants Hirsch, Bezdek, and Voermann for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

111.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.   GoodRx, along with Defendants Hirsch, Bezdek, and Voermann are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Hirsch, Bezdek, and Voermann's willful and/or reckless violations of their obligations as officers and/or directors of GoodRx.

113.   Defendants Hirsch, Bezdek, and Voermann, because of their positions of control and authority as officers and/or directors of GoodRx, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of GoodRx, including the wrongful acts complained of herein and in the Securities Class Action.

114.   Accordingly, Defendants Hirsch, Bezdek, and Voermann are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D

of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

115.   As such, GoodRx is entitled to receive all appropriate contribution or indemnification from Defendants Hirsch, Bezdek, and Voermann.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of GoodRx, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to GoodRx;

(c)   Determining and awarding to GoodRx the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing GoodRx and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GoodRx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of GoodRx to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of

compliance with applicable laws, rules, and regulations.

(e)     Awarding GoodRx restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: May 5, 2021                              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Wayne Geist am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

4/30/2021

Wayne Geist

Wayne Geist